IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ANTHONY WILLIAMS, | ) | Cause No. 2:03-CV-104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRUMP HOTELS & CASINO RESORTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION AND BACKGROUND**

Trump Indiana, Inc. ("Trump")[1] terminated plaintiff, Anthony Williams ("Williams") effective August 10, 2002 for three instances of misconduct and violations of company policy, including a written complaint that resulted in Trump losing a valuable customer. Mr. Williams now seeks to make a claim for discrimination by alleging he was terminated because of his race, African American, for an alleged disability, and for being on sick leave.

Williams' claims fail under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)(5), as amended by the Civil Rights Act of 1991 and 42 U.S.C. 1981a, as amended because: 1) he was not performing his job satisfactorily; 2) there were no Caucasian executive casino hosts who engaged in the same misconduct who were treated more favorably; and 3) he cannot show that Trump's reasons for terminating him were a lie. In turn, Williams' claims under the Americans with Disabilities Act, 42, U.S.C. § 12112, fail because: 1) he is not disabled as that term is defined under the Act; 2) he is not substantially limited in a major life activity; 3)

---

[1] Trump Indiana, Inc. has been Improperly named as Trump Hotels & Casino Resorts, Inc.

his work performance did not meet Trump's expectations; and 4) his alleged disability was not the motivation for Williams' termination. Finally, Williams' claims under the Family and Medical Leave Act, (FMLA) 29 U.S.C. §2601 et seq fail because he never applied for FMLA until after he was terminated.

For all of the above mentioned reasons, Williams' claims should be dismissed in their entirety.

## STATEMENT OF MATERIAL FACTS

**A.    Trump's Record on Hiring and Retaining Minorities**

Trump Indiana, Inc. is located in Gary, Indiana and provides a gaming environment complete with slot machines, live gaming, cocktail service, food service, shuttle service and hotel and convention space. (Joel Levy Deposition Exhibit 6). At the time Williams was terminated, 66% of Trump's workforce was minority. (Levy Dep. Ex. 6). Specifically, over 50% of its employees were African American and over 60% were female. (Levy Dep. Ex. 6). Trump has Caucasian and female employees in every job category. (Levy Dep. Ex. 6). Forty-eight percent of the officers and managers are minorities and 58% of the professional employees are minorities. (Levy Dep. Ex. 6). Trump is proud of its employment practices regarding the hiring and retention of minorities. (Levy Dep. Ex. 6).

**B.    Williams' Employment with Trump**

Williams began his employment with Trump in October, 1999 as a security officer making $9.00 per hour. (Deposition of Anthony Williams p. 26, lines 5-14; Deposition of John Irwin p. 18, lines 5-7). On October 5, 2000, Williams was transferred to the position of executive casino host where he remained until he was terminated on August 10, 2002. (Williams Dep. p 29, lines 20-25; Irwin Dep. p. 18, lines 1-4).

As an executive casino host, Williams was responsible for working at the casino and developing existing VIP customers. (Deposition of Daryl Jorman p. 37, lines 21-25; p. 38, lines 1-6).  Customer service is the most important responsibility for an executive casino host. (Irwin Dep. p. 86, lines 21-23; p. 87 lines 5-7).  They are looked on as ambassadors of customer service for the casinos. (Irwin Dep. p. 44, lines 10-12).  Because of the important role these hosts play, Trump cannot afford to have one deliver a bad experience to any of its guests. (Irwin Dep. p. 44, lines 12-14).  Providing excellent guest services and building personalized relationships with the players are the ways Trump separates itself from its competition. (Irwin Dep. p. 86, lines 21-25; p. 87, line 1).

At the time Williams was employed at Trump there were no Caucasian executive casino hosts. (Jorman Dep. p. 40, lines 2-4; Levy Dep. p. 46, lines 18-23).  Williams worked with other executive casino hosts, including:  Yancy Anderson, (African American), Barbara Lee, (African American), Tony Alvi, (Pakistanian), Crystal Jacobs, (African American), and Freddie Lee, (Chinese American). (Irwin Dep. p. 36, lines 21-25; p. 37, lines 15-25; p. 38, lines 1-13; p. 39, lines 21-22).  Daryl Jorman, (African American), worked as a senior executive casino host and was Williams' Supervisor. (Jorman Dep. p. 5, lines 9-12).  As a senior executive host, Daryl Jorman supervised Williams as well as the other executive casino hosts and reported to John Irwin, the Director of Player Development. (Jorman Dep. p. 10, lines 18-25; p. 11, lines 1-6; Irwin Dep. p. 13, lines 7-8; p. 20, lines 21-23).  As the Director of Player Development, John Irwin was responsible for increasing gaming revenues from VIP players by building relationships through telemarketing, written correspondence with players, personal interaction on the casino

floor and by providing excellent customer service. (Irwin Dep. p. 13, lines 9-25; p. 14, lines 1-13). [2]

In addition to the executive casino hosts and the casino hosts, Trump employs player development executives. (Jorman Dep. p. 37, lines 12-25). Unlike executive casino hosts, a player development executive concentrates on sales. (Irwin Dep. p. 40, lines 2-22). Specifically, player development executives are responsible for bringing new players to the casino and then it is the job of the casino hosts and the executive casino hosts to keep these players happy while they are at the casino. (Irwin Dep. p. 40, lines 2-22; Jorman Dep. p. 37, lines 23-25; p. 38, lines 1-6). Unlike executive casino hosts, player development executives have sales goals and objectives they are required to meet. (Id.). On average, player development executives are paid more because their job is much harder. (Jorman Dep. p. 38, lines 11-15). At the time Williams was employed, there were two player development executives, Paul Carcione, (Caucasian), and Joann Rialla, (Caucasian). (Irwin Dep. p. 50, lines 11-25; p. 51, lines 1-2; p. 38, line 25; p. 39, line 1; Levy Dep. p. 80, lines 19-20).

Irwin recommends termination. (Irwin Dep. p. 76, lines 23-24). However, all terminations must be approved by Trump's Director of Human Resources, Charolette Cook-Hawkins, (African American), or Joel Levy, (Caucasian) Trump's Employee Relations Manager. (Irwin Dep. p. 76, lines 23-24; Levy Dep. p. 9; lines 5-7; p. 74, lines 5-6, 22-24). Since Williams' termination, Irwin has not hired an executive casino host. (Irwin Dep. p. 65, lines 16-18). Irwin has hired two casino hosts who are both minorities, Ruby Coleman, (African American), and Jenny Ing, (Chinese). (Irwin Dep. p. 37, 13-17; p. 38, lines 4-7; p. 88, lines 12-

---

[2] In addition to executive casino hosts, Trump also employs executive hosts. (Irwin Dep. p. 66, lines 15-16). A casino host is an entry level position which has a lower level of responsibility. Casino hosts assist executive casino hosts and player development executives. (Irwin Dep. p. 66, lines 17-24). Casino hosts are still learning the business. (Irwin Dep. p. 67, lines 5-12).

16).  Irwin hired Michelle Pentecost, (Caucasian), as a player development executive. (Irwin Dep. p.50, lines 11-15; p.38, lines 10-11).  Irwin has also recommended the termination Carcione and Rialla. (Levy Dep. p. 80, lines 11-25; p.81, lines 1-2).

  **C.** **Williams' Repeated Violations of Company Policy**

   1. <u>The Willey Tate Brunch.</u>

On or about July 28, 2002,  Williams arranged a brunch for Trump VIP patron, Willie Tate and 29 of his guests. (Irwin Dep. p. 27, lines 13-14; p. 28, line 8; Williams Dep. Ex. 3).  As the executive casino host, it was Williams' responsibility to ensure that all arrangements for the brunch had been prearranged. (Williams Dep. Ex. 3; Irwin Dep. p. 27, line 25; p. 28, lines 1-3; p. 31, lines 1-7).

At the end of the brunch, the bill of $387.96 was presented to Mr. Tate. (Williams Dep. Ex. 3).  Mr. Tate explained that the meal was supposed to be paid for by Trump ("comped"). (Williams Dep. Ex. 3; Irwin Dep. p. 27, lines 14-15.)  Rosann Wityaz, the hotel sales manager, contacted Williams to verify this information. (Williams Dep. Ex. 3; Irwin Dep. p.27, lines 16-17.)  Williams informed  Wityaz that Trump was paying half of the bill and Magestic Star, a neighboring casino, was paying the other half. (Williams Dep. Ex. 3; Irwin Dep. p. 27, lines 17-19).  Williams then contacted Majestic Star and they refused to issue payment for the remaining balance. (Williams Dep. Ex. 3; Irwin Dep. p. 27, lines 19-21).  Mr. Tate left the casino and the bill was not settled. (Williams Dep. Ex. 3; Irwin Dep. p. 27, lines 22-23).  Williams then contacted Mr. Tate and asked him to pay the difference. (Williams Dep. p. 27, lines 23-24).

Later, Ms. Wityaz contacted Irwin about the incident. (Irwin Dep. p. 31, lines 13-20). After reviewing the facts, Irwin felt that Williams, as the lead person and organizer of the event, should have verified the payment agreement between Magestic Star and Mr. Tate prior to the brunch. (Irwin Dep. p. 27, lines 13-25; p. 28, lines 1-8; Levy Dep. 77, lines 4-7).  Irwin felt that

Williams placed a VIP player in very awkward and potentially embarrassing situation because prearrangements were not made. (Irwin Dep. p. 28, lines 8-11).  Moreover, Irwin believed it was inappropriate to request a guest pay a bill after arrangements were supposed to have been made and that this placed Trump is an unwanted position. (Irwin Dep. p. 28, lines, 11-13).  This was especially inappropriate since Trump takes the position that it is important not to create ill will between itself and its competitors such as Majestic Star. (Levy Dep. p. 35, line 25, p. 36, lines 1-19).  Irwin further believed Williams' failure to prearrange the payment for the brunch, placed Trump in an awkward position with Majestic Star. (Irwin Dep. p. 84, lines 14-24).

2. <u>Williams Fails to Return Company Property in a Timely Fashion.</u>

Later that same day, Williams' poor planning caused confusion, chaos, and added extra pressure on the team of employees that was trying to execute a Jet Ski event. (Irwin Dep. p. 35, lines 3-6). Williams had borrowed a PA system from Trump's special events coordinator for a car show. (Irwin Dep. p. 34, lines 20-21).  However, Williams failed to bring the PA system back in time to announce the winners of a Jet Ski giveaway that was being held. (Williams Dep. Ex. 3; Irwin Dep. p. 34, lines 22-25).  Williams failure to return the PA system in time made it difficult to successfully execute the event and embarrassed Trump. (Williams Dep. Ex. 3; Irwin Dep. p. 34, lines 23-25).

3. <u>Williams' Rude Behavior to Customer Elizabeth Thompson.</u>

In addition to discovering Williams' mismanagement of the Tate brunch and the PA system, Trump also received a serious written complaint about Williams from Trump patron Elizabeth Thompson. (Levy Dep. Ex. 10; Irwin Dep. p. 43, lines 18-25; p. 44, lines 1-3). Specifically, Thompson complained that she had a degrading and humiliating experience at Trump Casino on Friday, July 19, 2002." (Levy Dep. Ex. 10; Irwin Dep. p. 44, lines 4-6).  Ms. Thompson explained that Williams had contacted Trump's credit department to verify with

6

central credit that another casino, Harrah's, had made an error in her credit. (Levy Dep. Ex. 10; Irwin Dep. p. 48, line 11). After checking with central credit, Florence, of Trump's credit department, called and informed Williams of her finding. (Levy Dep. Ex. 10). Instead of handling the situation, Williams handed the phone to Thompson to resolve the situation. (Levy Dep. Ex. 10). Thompson waited an additional twenty minutes but there was still no resolution to the issue. (Levy Dep. Ex. 10). Thompson then provided Harrah's phone number to Williams, but Williams did not seem interested in calling to resolve the issue. (Levy Dep. Ex. 10). Upon reaching an executive host at Harrah's, Williams held a five to ten minute long distance conversation on Thompson's cell phone. (Levy Dep. Ex. 10). During this time, Thompson was subjected to hearing how Williams was a former police officer and how he once had a bad experience with his bank when he went to withdraw all of his money, and his hands got so tired from having to write so many zeros for the money he was withdrawing. (Levy Dep. Ex. 10).

 Once the credit line was reopened, Thompson repeated her initial request to Williams on increasing her line. (Levy Dep. Ex. 10). Williams told Thompson that he was not going to waste any more time with her and that he was going to smoke a cigarette. (Levy Dep. Ex. 10). At this point, Thompson stated that she "lost her dignity" and asked to speak to Williams' boss. (Levy Dep. Ex. 10). Williams told her that he was the boss. (Levy Dep. Ex. 10). Williams then looked around the room and told Thompson, "You don't want to talk to him, he's an asshole." (Levy Dep. Ex. 10). Thompson then told Williams she did not have to take any more this rude behavior and advised him that if he would not increase her line of credit, then she wanted to close her account. (Levy Dep. Ex. 10). Williams arrogantly and rudely stated "You don't have to go anywhere, I can close your account now." (Levy Dep. Ex. 10). Williams then moved toward the computer to close the account. (Levy Dep. Ex. 10).

7

During this time, Crystal Jacobs was observing the interaction between Thompson and Williams. (Levy Dep. Ex. 10). Jacobs immediately stepped in and took control of the situation by addressing Thompson's needs in a professional and courteous manner. (Levy Dep. Ex 10). Within ten minutes, Thompson's line was increased. (Levy Dep. Ex. 10). Jacobs took Thompson to the cafeteria to talk with her and apologized on behalf of the casino. (Levy Dep. Ex. 10). Based on her experience with Williams, Thompson wrote Trump a letter and expressed her opinion that "Williams did not possess the sensitivity, level of professionalism or people skills that are required to hold such a position." (Levy Dep. Ex. 10). Thompson then concluded her letter by stating she would not patronize a casino where she was treated so rudely. (Levy Dep. Ex. 10). According to Levy, the Thompson complaint was the most egregious letter Trump had received regarding a complaint by a customer. (Levy Dep. p. 88, lines 18-25, p. 89, lines 1-2).

### D. Trump Terminates Williams Employment

On August 6, 2002, Irwin and Levy met with Williams to discuss the two performance issues that had occurred on July 28, 2002 and the pending complaint by Thompson. (Irwin Dep. p 59, lines 24-25; p. 60, lines 1-10). Irwin and Levy informed Williams that based on these issues they were issuing a final written warning. (Irwin Dep. p. 60, lines 13-17). Irwin and Levy told Williams that they had received Thompson's written complaint and shared the allegations with him. (Irwin Dep. p. 43, lines 23-25). Irwin and Levy told him that they would be investigating the complaint and that it was a serious issue. (Irwin Dep. p. 60, lines 13-16; Levy Dep. p. 65, lines 5-11). Williams agreed that he had failed to follow proper procedures with respect to the brunch and the PA system, (Irwin Dep. p.61, lines 3-11) and signed the written warning. (Williams Dep. Ex. 3; Irwin Dep. p. 61, lines 7-8). Irwin and Levy gave Williams the ability to make comments on the final written warning, but he did not do so. (Levy Dep. p. 65, lines 22-25; p. 66, lines 1-2; p. 67, lines 21-23).

After the August 6, 2002 meeting, Williams did not return to work, but he called in sick the next day. (Irwin Dep. p. 62, p 22-25).  During this time, Irwin continued his investigation into Thompson's complaint. (Irwin Dep. p. 46, lines 5-6).  Irwin spoke to Freddie Lee, Jacobs and Thompson. (Williams Dep. Ex. 3; Irwin Dep. p. 46, lines 8-11).  Jacobs provided a written statement corroborating that Williams had been extremely rude to Thompson and her guest. (Levy Dep. Ex. 11; Levy Dep. p. 89, lines 3-6).  Moreover, Jacobs had to explain to Williams how to re-open the line of credit. (Levy Dep. Ex. 11).  Based on his investigation, Irwin determined that Williams' conduct toward Thompson was a significant violation of company standards and policies. (Williams Dep. Ex. 3).  Specifically, Irwin found that Williams was discourteous to a customer and was negligent in the performance of his job duties. (Williams Dep. Ex 3).  Based on the three incidents Irwin recommended Williams' termination on August 9, 2002. (Williams Dep. Ex. 3; Irwin Dep. p. 55, lines 4-19).  Cook-Hawkins approved Williams' termination and he was terminated on August 10, 2003. (William's Dep. Ex. 3).  Trump notified Williams of his termination by letter dated August 13, 2002. (Williams Dep. Ex. 3).

On August 13, 2002, Williams completed a form for family and medical leave. (Levy Dep. Ex 1).  At the time Irwin recommended Williams' termination and Williams was terminated, neither Irwin nor Levy had received notice that Williams had completed the FMLA form. (Deposition of Joel Levy pp. 78-79, lines 21-25 and 1-16; Williams Dep. Ex. 4).  Irwin only knew that Williams had called off sick. (Irwin Dep. p. 63, lines 2-9; p. 71, lines 8-11).

## ANALYSIS

### A. Summary Judgment Standard

Summary Judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a

9

matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) *("Celotex").* A genuine issue of material fact does not exist unless there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Methodist Med. Center of Illinois v. American Med. Sec., Inc.*, 38 F.3d 316, 319 (7th Cir. 1994). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex* at 322-23; *Reed v. Amax Coal Co.*, 971 F.2d 1295, 1299 (7th Cir. 1992). (If a plaintiff cannot establish one element of the prima facie case, summary judgment for defendant is proper); *Lloyd v. Bridgeport Brass Corp.*, 811 F.Supp 401, 405 (S.D. Ind. 1993).

A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Anderson*, 477 U.S. at 248. The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992). This burden cannot be met with conclusory statements, opinion or speculation, but only with appropriate citations to relevant admissible evidence. See *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994); see also *Brasic v. Heinemann's, Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir. 1997); *Weihaupt v. American Med. Assoc.*, 874 F.2d 419, 428 (7th Cir. 1989). Further, the non-movant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

### B.  Williams Cannot Establish a Prima Facie Case of Race Discrimination [3]

Whether based on sex, race, color, or age, a claim of discrimination requires proof that

---

[3] For simplicities sake and because they are analyzed under the same rubric, we will address Williams' claims under Title VII and Section 1981 simultaneously. *Alexander v. Wis. Dept' of Health and Human Servs.,* 263 F.3d 673, 681, 82 (7th Cir. 2001).

the alleged disparate treatment occurred because of the plaintiff's protected characteristic. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999); 42 U.S.C. § 2000e-2(a)(1). Williams has no direct evidence of race discrimination, and therefore must rely on the burden-shifting method of proof to establish his claims. That method requires evidence sufficient to create a genuine issue regarding:

1) membership in a protected group (race);
2) satisfactory job performance;
3) an adverse employment action; and
4) more favorable treatment of similarly situated employees outside the protected group.

*Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 530 (7th Cir. 2003); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003).

There is no question that Williams is in a protected group based on his race. However, he cannot show he was performing his job satisfactorily or that he was treated less favorably than Caucasian executive casino hosts.

As previously discussed, Williams repeatedly failed in his duties as an executive casino host. First, he did not prearrange payment for the Tate brunch. As the executive host, he was ultimately responsible for ensuring that arrangements were made prior to the brunch. By not making the appropriate arrangements, Williams placed Tate, Wityaz, Trump and Majestic Star in an awkward position. Moreover, Williams compounded the problem when he approached Tate, a VIP patron, and directly asked him to pay half of the bill. This type of conduct from an executive casino host is completely inappropriate and inexcusable.

Second, on the same day as the Tate brunch, Williams failed to return a piece of equipment which caused problems with a subsequent event. Again, it was Williams' responsibility as an executive casino host to familiarized himself with the various activities that

11

were taking place on the property. (Levy Dep. p. 77, lines 20-25; p. 78, lines 1-10). He simply did not fulfill his obligations to Trump or its customers.

The final straw came when Williams treated customer Thompson so poorly that she complained, in writing, to the General Manager, Cathy Walker, and expressed her unwillingness to return to Trump. Williams' conduct toward Thompson runs completely counter to his responsibilities as an executive casino host. Williams was hired and paid to be an "ambassador" to Trump's guests. Trump could no longer afford to have Williams continue to damage its relationships with its customers. Accordingly, Williams was not performing his job satisfactorily and was therefore terminated. Because of this, Williams cannot establish a prima facie case.

In addition to not performing his job satisfactorily, Williams has no evidence that Caucasian executive casino hosts were treated more favorably. To meet the burden of identifying a similarly situated employee, a plaintiff must show that someone outside the protected class is "directly comparable to her in all material respects," including experience, education, and qualifications. *Patterson v. Avery-Dennison Corp.,* 281 F.3d 676 680 (7th Cir. 2002). A plaintiff must present specific evidence that employees who were treated better had the same qualifications; general allegations of better treatment will not suffice. *Pafford v. Herman*, 148 F.3d 658, 668 (7th Cir. 1998). Here, this means that Williams must show that Caucasian casino executive hosts who engaged in the same misconduct remained employed. However, Williams cannot meet this burden because there were no Caucasian executive casino hosts who worked with him. Furthermore, there is no evidence in the past, that Caucasian executive casino hosts were treated more favorably than African American executive casino hosts. (Jorman Dep. p. 6, lines 24-25; p. 7, lines 1-8). Williams cannot establish the fourth prong of his prima facie case and his case fails for this reason as well.

### C.       Williams Cannot Show the Reasons for His Termination Were Lies

Assuming, without conceding, that Williams could establish a prima facie case of discrimination, Trump has provided a legitimate, non-discriminatory reason for Williams' termination, and Williams has no evidence that the reasons provided by Trump for his termination were lies.  Williams must present evidence that Trump's proffered reasons for his termination were a pretext.  *Simpson v. Borg-Warner Auto.*, Inc., 196 F.3d 873, 878 (7th Cir. 1999).  In cases discussing the nature of the pretext inquiry, courts have held that it is not enough for Williams to show that Trumps' explanation was based on an inaccurate information.  See, e.g., *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998); see *Walker v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001) ("The court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took.").  "'Pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks."  *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001).  Without proof of a lie, no inference of discriminatory motive can be drawn. Id.

Williams can do none of these.  As already outlined above, Trump terminated Williams for his three violations of company policy and misconduct all of which which occurred within nine days.  Williams admitted to mishandling two of the issues.  After investigating the Thompson matter,  Irwin found there were discrepancies with Williams' version of events and those of Thompson and Jacobs. (Irwin Dep. p. 43, line 25, p. 44, line 1).  While Williams may allege that Trump's investigation into the Thompson matter was unwarranted and that the decision to terminate him was based on inaccurate information, this is not enough.  Instead, Williams must show that Trump's reasons for terminating him for his misconduct over the Tate brunch, the PA system and the Thompson complaint were lies.  This he cannot do.

13

**D.     Williams Cannot Make a Prima Facie Case of Disability Discrimination**

   1.     <u>Williams is not a qualified individual with a disability as defined by the ADA.</u>

The Americans With Disabilities Act makes it unlawful to "discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). To establish a claim of discrimination under the ADA, Williams must show: 1) that he was a "qualified individual with a disability;" 2) that his work performance met Trump's legitimate expectations; 3) that he suffered an adverse employment action; and 4) that his disability was the motivation for the adverse employment action. *Tyler v. Ispat Inland, Inc.,* 245 F.3d 969, 971 (7th Cir. 2001)(*citing Leffell v. Valley Fin. Servs.* 113 F.3d 787, 794 (7th Cir. 1997)).

The ADA defines "disability" as a (1) physical or mental impairment that substantially limits one or more of the major life activities, (2) having a record of such an impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12112(2). The ADA was designed to protect an important, but finite, universe of individuals. *Waggoner v. Olin Corp.,* 169 F.3d 481, 484 (7th Cir. 1999). It does not protect everyone with an impairment, only those impairments that are found to limit a major life activity. *Id.*  As a rule, a disability under the Act does not include temporary medical conditions. *Waggoner*, 169 F.3d at 484 (citing *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, (7th Cir. 1997)).

Williams does not have an impairment that substantially limits him in a major life activity. During his deposition, when Williams was asked about the nature of his alleged disability, Williams testified:

   Q:     What is your disability?

   A:     Due to the fact that, ma'am, I thought I was having a heart attack under stress, that they had put me through? After all

14

> I had done, how would you feel? It hurt me so bad. I didn't know what was happening to me at that time, but I went on partially through the day, after I left the office with Joel Levy and John Irwin. My chest was pounding, my arm was hurting me so bad, I didn't know what was going on.

(Williams Dep. p. 144, lines 7-16). Williams testified he only sought treatment for chest pain at the Hammond Clinic on two occasions. (Williams Dep. p. 114, lines 18-20). The last date he received treatment was September 4, 2002. (Williams Dep. p. 115, lines 1-3). Moreover, according to Williams' physician he could return to work on September 11, 2002 without any restrictions. (Williams Dep. p. 117, lines 3-10). Williams currently does not have any restrictions that would preclude him from finding employment. (Williams Dep. p. 154, lines 2-4).

This testimony amply demonstrates that, at most, Williams suffered from a temporary illness for which he sought medical treatment on two occasions. He had no restriction of any kind. This is not the type of temporary impairment that is protected by federal law.

### 2.  Williams was not meeting Trump's legitimate expectations.

For the same reasons as outlined above, Williams cannot show that he was meeting Trump's expectations. Williams was consistently mishandling situations which culminated in Trump losing a VIP customer. In a business where customer service is key, Williams conduct was inexcusable. Accordingly, his claim fails for this reason as well.

### 3.  Williams' alleged disability was not the motivation for his termination.

Even if Williams' temporary condition, constituted a disability under the Act, the undisputed evidence shows that Trump terminated him for his conduct and not because he was disabled. The only documentation concerning his illness was received by Trump after he was terminated. (Levy Dep. Exs. 1 and 2). This included a doctor's slip stating he suffered from

15

chest pain, pain in his left arm, chest and stomach. (Levy Dep. Exs. 1 and 2). Moreover, Williams admits that prior to time that he completed his application for FMLA, he had not given anyone at Trump any documentation concerning his condition. (Williams Dep. p. 104, lines 12-15). At most Trump knew Williams was out sick for a couple of days. The fact Trump knew Williams was out sick is not sufficient to establish that Williams' alleged disability was the motivation behind his termination. *Huff v. UARCO, Inc.*, 122 F.3d 374 (7th Cir. 1997).

### E.   Williams' Harassment Claims Exceed the Scope of His Charge

While it is not clear whether Williams is making a claim for harassment, any such claim is barred because neither Williams' original charge nor his amended charge mention or even imply that Williams was subjected to a hostile environment on the basis of race or disability. (Charge of Discrimination and Amended Charge of Discrimination). He cannot now assert claims in his lawsuit that were not mentioned, described, or even alluded to, in his charge. *See Ajayi*, 336 F.3d 520. The charge functions to delimit the scope of evidence to which the EEOC is entitled during an investigation. *Id*. Only evidence that is relevant to the charge under investigation may be sought. *EEOC v. Shell Oil Co*., 466 U.S. 54, 68, 104 S.Ct. 1621, 1631 (1984).

A Title VII lawsuit may only contain allegations that are 'like or reasonably related' to the underlying charges. *EEOC v. Jillian's of Indianapolis, IN, Inc.*, 279 F.Supp.2d 974, 979 (S.D. Ind. 2003). That is, there must be a factual relationship between the charge and the complaint. *Id.* At a minimum, they must describe "the same conduct and implicate the same individuals." *Id*. A general allegation of discrimination in a charge does not allow a plaintiff to bring in a specific example about an individual's alleged wrongful conduct that was not even mentioned in a general way in the charge. *Ajayi*, 336 F.3d at 530. For example, when a charge complains of discrimination in the denial of a promotion, allegations of a denial of benefits,

harassment or adoption of a discriminatory policy would be beyond the scope of the charge.  *Id*. (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110-12 (7th Cir. 1992)).

Williams had two opportunities to raise a claim for harassment based on race and disability.  He chose not to do so.  Accordingly, any such claim is barred.

### F.     Williams' FMLA Claim Fails

The Family and Medical Leave Act of 1993 ("FMLA") (29 U.S.C. § *2601 et seq.*) entitles "eligible employees" to as much as twelve (12) weeks' unpaid leave per year in order to cope with major illnesses and important family events.  *Collins v. NTN-Bower Corp*, 272 F.3d 1006, 1007 (7th Cir. 2001).  To be eligible for leave, the employee must both (1) have a "serious health condition" as that term is defined under the FMLA, and (2) that condition must prevent the employee from performing his job.  *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998).  The FMLA imposes limitations on a employer's obligation to reinstate an employee.  Specifically, the regulations provide that an employee like plaintiff has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. 29 C.F.R. § 825.216(a).  *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672 (7th Cir. 1997).

The undisputed evidence shows that based on the repeated and increasing severity of Williams' misconduct, Trump made the decision to terminate Williams' employment.  The documents show that Irwin made the decision to terminate Williams on August 9, 2002 and that the termination was effective August 10, 2004.  Williams' application for FMLA was not completed until August 13, 2002 -- three days after he was terminated.  Accordingly, the decision to terminate Williams was made <u>prior to</u> the time he requested the leave.  Even if he had applied for leave prior to his termination, Trump would have terminated Williams irrespective of

17

his request for leave. Thus, there is no violation under the FMLA and Trump is not required to reinstate him under the FMLA.

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted against Anthony Williams on all of his claims.

LOCKE REYNOLDS LLP

By:  /s/ Heather L. Wilson
    John H. Daerr #14722-53
    Heather L. Wilson #20432-41
    Attorneys for Defendant Trump Hotels &
    Casino Resorts, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system and a copy of the foregoing has been forwarded to the following party of record via first class United States Mail, postage prepaid, on this 1st day of November, 2004.  Parties may access this filing through the Court's system.

Mr. Anthony Williams
742 Johnson Street
Gary, Indiana  46402

      /s/ Heather L. Wilson
      Heather L. Wilson

LOCKE REYNOLDS LLP
201 North Illinois Street, Suite 1000
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
hwilson@locke.com

**684002_1**